IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:25-CV-59

| | | |
|---|---|---|
| ARNOLD JEROME SMITH<br><br>*Plaintiff*,<br><br>v.<br><br>STATE OF NORTH CAROLINA, NORTH CAROLINA OFFICE OF RECOVERY AND RESILIENCY AND EXCEL CONTRACTORS, L.L.C.<br>*Defendants*. | ) | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff, Arnold Jerome Smith, by and through his attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits the following Memorandum of Support, attached Local Civil Rule 56.1 Statement of Material Facts, Appendix to Local Rule 56.1 Statement of Material Facts, and all referenced documentation in support of his Motion for Partial Summary Judgment. Plaintiff clearly shows that no genuine issue of material fact exists establishing all Defendants are liable for violations of the federal Fair Housing Act and Section 504 of the Rehabilitation Act of 1973; Defendants State of North Carolina and NCORR are liable for violations of the Americans with Disabilities Act; and Defendant Excel is liable for breach of a valid contract.

The material facts of this case are straightforward and undisputed. Mr. Smith requires the use of a wheelchair due to the amputation of his left leg. (Statement of Material Facts[1] ¶¶ 1&2; Appendix Ex. 1 ¶ 2). His home was severely damaged during Hurricanes Matthew, in 2016, and Florence, in 2018. (SMF ¶ 6; Appendix Ex. 4 p. 33:7-16; Appendix Ex. 1 ¶ 6). He qualified to receive housing assistance through the Community Development Block Grant – Disaster Recovery ("CDBG-DR") Homeowner Recovery Program. (SMF ¶ 7; Appendix Ex. 14 p. 1). As recipients of federal financial assistance, Defendants were required to provide a home that met Mr. Smith's disability-related housing needs. (Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21). Defendants failed to do so. (Appendix Ex. 3 p. 5-16). Defendants denied Mr. Smith the full benefits of their CDBG-DR Homeowner Recovery Program by refusing to adhere to the requirements of the FHA, Section 504, as well as the ADA. Through their actions, Defendant Excel additionally breached a valid contract for the replacement of Mr. Smith's home.

## **STATEMENT OF THE CASE**

Mr. Smith filed this action on April 1, 2025, alleging disability discrimination under the FHA, Section 504, and the ADA; and seeking declaratory, injunctive, and monetary relief. (ECF 003). Discovery began on August 1, 2025 (ECF 016). On April 21, 2026, the parties met for a mediated settlement conference, which failed to resolve the issues in this case. (Appendix Ex. 18). An Amended Complaint was filed on May 14, 2026 (ECF 039), adding a claim for breach of contract against all Defendants. Subsequently, the Court extended discovery to June 15, 2026, and also extended the deadline for dispositive motions to August 17, 2026. (ECF 045). Since August 1, 2025, the parties have conducted extensive discovery, including multiple rounds of interrogatories; substantial requests for production; and depositions from all parties and Plaintiff's

[1] Hereinafter "SMF".

experts. The undisputed material facts[2] of this case satisfy the elements of Mr. Smith's claims, and any fact alleged to be in dispute is not material to those claims.

## STANDARD OF REVIEW

A party may be granted summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is material if proof of its existence or non-existence would affect disposition of the case under applicable law" and "[a]n issue of material fact is genuine if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures L.L.C.*, 980 F.3d 1027, 1037 (4th Cir. 2020). In determining whether genuine issues of fact exist, all ambiguities are resolved, and all inferences drawn in favor of the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654 (1962). However, "an adverse party may not rest upon the mere allegations or denials of his pleading, but [...] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita Electronic Indus. V. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## ARGUMENT

As administrators and contractors of the CDBG-DR Homeowner Recovery Program, Defendants were required to comply with Section 504 and other federal civil rights laws prohibiting disability discrimination. (Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21). HUD's guidance required CDBG-DR grantees, including these Defendants, to meet accessibility standards, provide reasonable accommodations, and address the functional needs of individuals with disabilities. (Appendix Ex. 5 p. 26, 51, 62). Defendants caused Mr. Smith's replacement home to be constructed so that it was not accessible to him as a disabled individual

---

[2] See the attached Rule 56.1 Statement of Material Facts and Appendix to the Statement of Material Facts.

and did not address his functional needs. (Appendix Ex. 1 ¶ 10-17; Appendix Ex. 2 p. 10:6-12, 32:7-23, 65:24-25, 66:1-2, 69:19-25, 70:1-24; Appendix Ex. 3 p. 5-16). Mr. Smith repeatedly requested accommodations to address the home's deficiencies; Defendants refused to grant the requested accommodations to their policies. (Appendix Ex. 8 p. 27 ¶ 7.4.2; Appendix Ex. 9 p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 11 p. 53:8-11).

There is no genuine issue of fact that the home Defendants provided to Mr. Smith did not meet basic accessibility standards. (Appendix Ex. 2 p. 10:6-12, 32:7-23, 65:24-25, 66:1-2, 69:19-25, 70:1-24; Appendix Ex. 3 p. 5-16). Specifically, Defendants provided a home where (1) Mr. Smith is unable to safely use his bathtub for four years and counting; (2) Defendant refused to grant reasonable accommodations and modifications that would have provided accessibility features enabling him to have full use and enjoyment of his home; and (3) Defendant Excel refused to construct an accessible replacement home for Mr. Smith, not complying with the CDBG-DR rules, procedures and/or requirements provided in their contract. (SMF 42; Appendix Ex. 1 ¶ 7, 10-17; Appendix Ex. 2 p. 32-33; Appendix Ex. 3 p. 5-16; Appendix Ex. 4 p. 15:13-25, 16, 17:17-25, 18:1-5, 21:11-25, 22-23, 24:1-2; Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21). Thus, Defendants unlawfully discriminated against a disabled person by refusing to provide an accessible replacement home to Mr. Smith, and by denying him reasonable accommodations and modifications that would have made his home usable and accessible. As a matter of law, Mr. Smith is entitled to partial summary judgment for liability on the claims as provided herein.

## A. DEFENDANTS FAILED TO PROVIDE AN ACCESSIBLE DWELLING AS REQUIRED BY FEDERAL LAW AND THEIR OWN PROGRAM REQUIREMENTS

Each of the governing federal statutes, the FHA, Section 504, and the ADA, mandate certain standards of accessibility for handicapped or disabled individuals[3], which are similar in scope and application.

Because Defendants were administering a program using federal financial assistance, they were required to ensure the benefits of that program were readily accessible and useable by persons with disabilities. (Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21). This program's benefit was the rehabilitation, reconstruction, and replacement of homes, so Defendants were required to ensure the homes provided were accessible and useable to applicants with disabilities. (Appendix Ex. 7 p. 19-21).

A HUD notice governing this CDBG-DR program issued on February 9, 2018, provided a link to "[a] checklist of accessibility requirements under the Uniform Federal Accessibility Standards (UFAS)" as well as a citation for the "HUD Deeming Notice" which explains "when HUD recipients can use 2010 ADA Standards with exceptions, as an alternative to UFAS to comply with Section 504." (Appendix Ex. 5 p. 62).[4] The "HUD Deeming Notice" provides recipients of federal financial assistance permission to use the 2010 ADA Standards for Accessible Design ("2010 ADA Standards") with some limitations as an acceptable alternative to the accessibility standards of the UFAS and remain in compliance with Section 504 and its

---

[3] The FHA and 42 U.S.C. §5324 use the more archaic, but identical, term "handicap." Here, we will use the term "disability." See *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (noting that the definition of "disability" in the ADA is drawn almost verbatim from the FHA definition of "handicap.")

[4] Further, implementing regulations of Section 504 of the Rehabilitation Act of 1973 at 24 C.F.R. Part 8 and federal court opinion, discussed below, establish that the requirements to meet federal accessibility standards apply even to single-family homes provided to homeowners.

implementing regulations at 24 CFR Part 8. *Nondiscrimination on the Basis of Disability in Federally Assisted Programs and Activities*, 79 Fed. Reg. 29671 (May 23, 2014). Additionally, an August 14, 2018, HUD notice provided that "a grantee may consider offering different housing alternatives, as appropriate, such as manufactured housing options. [...] Each grantee must adopt policies and procedures that communicate how [...] the grantee will make reasonable accommodations to provide accessibility features necessary to accommodate an occupant with a disability." (Appendix Ex. 5 p. 51).

As established, the UFAS or the 2010 ADA Standards, with exceptions, meet the accessibility standards required to comply with Section 504 and its implementing regulations at 24 CFR Part 8. "A HUD recipient must designate the accessibility standard it is using: [t]he 2010 [ADA] Standards with identified exceptions [...] or UFAS." *Nondiscrimination on the Basis of Disability in Federally Assisted Programs and Activities*, 79 Fed. Reg. 29671, 29672 (May 23, 2014). Departures from these standards are permitted only "where substantially equivalent or greater access to and usability of the building is provided." 24 CFR §8.32.

The contract between the parties for the replacement and elevation of Mr. Smith's home incorporates these standards. (Appendix Ex. 12 p. 7). It is undisputed that one of Mr. Smith's legs is amputated at the knee, and he uses a wheelchair. (SMF ¶ 1&2; Appendix Ex. 1 ¶ 2) It is further undisputed that Mr. Smith qualified to have his home replaced through the CDBG-DR Homeowner Recovery Program and tendered to Defendant NCORR a check in the amount of $1,118.84 to pay for part of the replacement and elevation. (Appendix Ex. 14 p. 1).

Defendants State of North Carolina and NCORR issued a bid solicitation for a group of construction projects, including the replacement of Mr. Smith's home. (Appendix Ex. 11 p. 3:17-24 Appendix Ex. 12 p. 19). This bid solicitation states, "Services provided include replacement of

[Manufactured Housing Units] including units meeting ADA compliance requirements," and issued construction specifications under headings: "ADA Manufactured Housing Unit;" "standardized ADA compliant [...] units;" "ADA Unit;" "ADA Unit Cabinets;" "ADA Unit Doors;" and so on. (Appendix Ex. 12 p. 19-22). However, the specifications and measurements listed in the bid solicitation are insufficient to meet requirements of the 2010 ADA Standards or UFAS for residential dwellings.[5] Further, they do not provide "substantially equivalent or greater access" as contemplated by 24 CFR §8.32. (Appendix Ex. 3 p. 5-16).

For example, the specifications provided in Defendants State of North Carolina and NCORR's bid solicitation to Defendant Excel does not include any floor space requirements or other space requirements for a wheelchair. (Appendix Ex. 12 p. 19-22). The 2010 ADA Standards and UFAS require accessible routes[6] and a minimum floor clearance to provide turning space[7] in residential dwelling units, including minimum space requirements in bathrooms[8]. The home provided to Mr. Smith lacks an accessible route connecting all spaces and elements of the residential dwelling, as required by the 2010 ADA Standards 809.2.1.[9] Further, Defendants did not even meet their own specifications. For example, the specification for "ADA Unit Doors" notes that a width of 32"- 48" is required, yet Defendants provided only three (3) doors meeting this specification out of the nine (9) total doors in the home. (Appendix Ex. 3 p. 5-16).

---

[5] Defendants State of North Carolina and NCORR also issued CDBG-DR Construction Management Standard Operating Procedures which provided more specifications (Appendix Exhibit 13) but still does not meet accessibility requirements.
[6] 2010 ADA Standards 809.2; UFAS 4.3.
[7] 60" minimum diameter turning space or 60" square with arms and base 36" minimum for a T-shaped space. 2010 ADA Standards 304.3; substantially similar requirements provided in UFAS 4.3.
[8] 2010 ADA Standards 603.2; UFAS 4.20.2.
[9] UFAS 4.34.2 is more specific and requires an accessible unit to have the following spaces be accessible at a minimum: the entrance, storage (including closets), all controls, emergency alarms, at least one bathroom, kitchen, laundry, living room, dining room, at least two bedrooms in a unit with two or more bedrooms, and most outside structures provided with the dwelling.

The undisputed expert evidence establishes that the home Defendants provided to Mr. Smith does not provide features meeting the 2010 ADA Standards or the UFAS and does not provide alternatives that grant substantially equivalent or greater access or usability. (Appendix Ex. 3 p. 5-16). Defendants even failed to meet their own lesser alternative standards. (Appendix Ex. 3 p. 5-16). During their June 15, 2026, deposition, the experts retained by Mr. Smith testified (1) that an in-person accessibility assessment of Mr. Smith's home was conducted; (2) the report prepared based on that assessment accurately reflected their expert opinions; and (3) that their assessment concluded that "[t]he conditions observed would prevent a person in a wheelchair from safely, effectively, and independently using this home." (Appendix Ex. 2; Appendix Ex. 3 p. 5-16).

## B. DEFENDANTS VIOLATED THE FAIR HOUSING ACT

42 U.S.C. §3604(f) provides, in relevant part, that

> "it shall be unlawful [...]
> (f)(1) [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of - (A) that buyer or renter [...]
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of - (A) that person [...]
> (3) For the purposes of this subsection, discrimination includes - (A) refusal to permit, at the expense of the handicapped person[10], reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises [...] (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling [...]."

The undisputed facts establish that Defendants are liable for violations of the federal Fair Housing Act ("FHA") by denying or otherwise making housing unavailable to Mr. Smith because of his disability;[11] discriminating against him in the terms, conditions or privileges in the

[10] See footnote 13.
[11] 42 U.S.C. § 3604(f)(1).

provision of services or facilities in connection with such his dwelling;[12] and refusing to grant his disability-related requests for reasonable accommodations or modifications to the home provided.[13]

1. **<u>Defendants Are Subject to the Requirements of the Federal Fair Housing Act</u>**

It is undisputed that Defendants State of North Carolina and NCORR administered a housing recovery program with federal CDBG-DR funds and contracted with Defendant Excel to rehabilitate, reconstruct, or replace hurricane-damaged homes. (SMF ¶¶ 8-11, 22; Appendix Ex. 11 p. 30:17-24).

The Fair Housing Act explicitly specifies that its prohibitions against housing discrimination apply to those "dwellings provided in whole or in part with the aid of loans, advances, grants, or contributions made by the Federal Government [...]." 42 U.S.C. §3603(a)(1)(B).

The federal statutes establishing the CDBG program also specifically require conformity with the FHA: a grant of CDBG-DR funds "shall be made only if" the grantee certifies that "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 (42 U.S.C. 2000A *et seq*.) and the Fair Housing Act (42 U.S.C. 3601 *et seq*.)." 42 U.S.C. §5324(d)(2).

A State "shall not be immune under the Eleventh Amendment of the Constitution of the United States from a suit in Federal court for a violation of [...] the provisions of any other federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. §2000d-7(a)(1). Courts have generally held that the language of §2000d-7 obviates a state's immunity from

---

[12] §3604(f)(2).
[13] §3604(f)(3). While 42 U.S.C. 3604(f)(3)(A) specifies that reasonable modifications are "at the expense of the handicapped person," Section 504 of the Rehabilitation Act of 1973 – discussed further below- shifts this financial burden to the housing provider when the housing is federally funded. 29 U.S.C. 794(c); *Alexander v. Choate*, 469 U.S. 287 (1985).

discrimination suits from "other federal statue[s]" if the applicable statute limits its "substantive antidiscrimination provisions to recipients of federal funding." *Sullivan v. Tex. A&M Univ. Sys*., 986 F.3d 593 (5th Cir. 2021). Because the FHA itself applies more broadly than merely to recipients of federal funding, the FHA by itself does not waive state sovereign immunity. See *Gregory v. S.C. Dep't of Transp.*, 289 F. Supp. 2d 721, 724-25 (D.S.C. 2003).

Even though the FHA alone does not waive immunity through 42 U.S.C. §2000d-7, the CDBG enabling statute does. 42 U.S.C. §5301 *et seq.* The CDBG statute incorporates the nondiscrimination requirements of Section 504 of the Rehabilitation Act of 1973 through its implementing regulations at 24 CFR Part 6 and makes it a condition precedent that a grantee certify the grant will be "conducted and administered in conformity with the Civil Rights Act of 1964 (42 U.S.C. 2000A *et seq*.) and *the Fair Housing Act* (42 U.S.C. 3601 *et seq*.)." (emphasis added) 42 U.S.C. §5324(d)(2). Here, the enacting statute of CDBG-DR clearly incorporates the nondiscrimination provisions of the Fair Housing Act as its own substantive anti-discrimination provisions and limits the applicability of these provisions solely to recipients of federal funding, namely those who receive CDBG-DR funds. While the Fair Housing Act alone does not waive sovereign immunity, the CDBG-DR statute is sufficiently limited to properly waive sovereign immunity (through 42 U.S.C. §2000d-7(a)(1)) because the CDBG statute only applies to recipients of federal funding. By accepting federal financial assistance through CDBG-DR funds, Defendants State of North Carolina and NCORR waived state sovereign immunity from nondiscrimination claims under the Fair Housing Act.[14]

---

[14] However, even if the Court hold that these Defendants did not waive immunity by accepting CDBG-DR funds, they further waived any claims through conduct incompatible with an intent to preserve immunity. See *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003); *Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 801-02 (S.D. Ohio 2012); and, *LA Terminals, Inc., v. City of Los Angeles,* 2025 U.S. Dist. LEXIS 69804 (C.D. Cali. 2025).

**2. <u>The Material Facts Establish Defendants Discriminated Against Mr. Smith Because of His Disability.</u>**

A plaintiff may be entitled to recovery under the FHA by proving at least one of three types of FHA violations under 42 U.S.C. §3604(f): (1) intentional discrimination; (2) practices causing widespread discriminatory impact; and/or (3) a refusal to grant a reasonable accommodation or modification request. *Evans v. ForKids, Inc.*, 306 F.Supp.3d 827, 834-835 (E.D.Va. 2018). Here, Mr. Smith alleges Defendants violated the FHA through intentional discrimination and the refusal to grant a reasonable accommodation or modification request.

A plaintiff may establish intentional discrimination under the FHA through direct evidence of discrimination. *Martin v. Brondum*, 535 F.App'x 242, 244 (4th Cir. 2013) (citing *McDonnell Douglass Corp v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision." *Id*. As evidence of discriminatory intent, courts may look to the impact of an official decision, the historical background behind a decision, or the specific sequence of events leading up to a decision. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977); see also *CMDS Residential, LLC v. Mayor of Baltimore*, 714 F. Supp. 3d 583 (D.C. Md. 2024).

To establish defendants violated the FHA by refusing to grant a reasonable accommodation or modification request, plaintiff must prove that they have a disability and that the request was "(1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc v. Howard Cnty., Md.*, 124 F3d 597, 603-04 (4th Cir. 1997).

As an initial matter, claims under 42 U.S.C. 3604(f) require that the individual plaintiff be a "buyer or renter" and have a disability. "A claimant is said to be a 'buyer or renter' under the FHA when he or she supplies consideration in exchange for an interest in property." *Wartluft v.*

*Milton Hershey Sch. & Sch. Trust*, 400 F. Supp. 3d 91, 104 (M.D. Pa. 2019). Here, Mr. Smith paid $1,118.84 for part of the replacement and elevation of his home.[15] (Appendix Ex. 14 p. 1). An individual has a disability when they have either, "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) [is] [...] regarded as having such an impairment [.]" 42 U.S.C. §3602(h). There is no dispute that Mr. Smith requires the use of a wheelchair. (SMF ¶¶ 1&2; Appendix Ex. 1 ¶ 2). A "major life activity" refers to those activities "that are of central importance to daily life" *Rohan v. Networks Presentations LLC*, 375 F3d 266, 274 (4th Cir. 2004). A "major life activity" includes walking. 24 CFR §100.201(b). Mr. Smith's disability, an amputation of his leg, substantially limits his ability to walk, a major life activity. (SMF ¶ 1). His use of a wheelchair is necessary to allow him to move around. (SMF ¶ 2; Appendix Ex. 1 ¶ 2).

**a. Defendants intentionally discriminated against Mr. Smith by denying or otherwise making housing unavailable to him based on his disability in violation of 3604(f)(1)**

42 U.S.C. §3604(f)(1) provides that it shall be unlawful, "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of [...] that buyer."

It is already established that (1) Mr. Smith is a buyer;[16] and (2) he is a person with a disability. (SMF ¶¶ 1&2). It is further undisputed that Mr. Smith's home is his primary residence (SMF ¶ 4; Appendix Ex. 1 ¶ 4; Appendix Ex. 14 p. 1) and is, therefore, a dwelling as defined by the FHA.[17] The homes rehabilitated, reconstructed, or replaced with CDBG-DR funds were

---

[15] This distinguishes him from the holding in *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F2d 1277, 1283n.10 (3d Cir. 1993) ("Because the handicapped individuals in this case are not supplying the funds nor seeking proprietary interest in the property, they are neither buyers nor renters.").
[16] See citations and accompanying text for *Wartluft* (above) and *Growth Horizons* (at footnote 15).
[17] A dwelling is defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families [...]." 42 U.S.C. §3602(b).

provided where necessary "to make a homeowner's primary residence sanitary, safe, energy efficient, [and] resilient [...]." (Appendix Ex. 8 p. 7). The home provided to Mr. Smith through the CDBG-DR Homeowner Recovery Program replaced his primary residence. (Appendix Ex. 14 p. 1).

Defendants knew that Mr. Smith is person with a disability and requires the use of a wheelchair full-time due to an amputation of his left leg because he specifically requested, verbally and in writing, a home with accessibility features to meet his disability-related housing needs. (Appendix Ex. 1 ¶ 7; Appendix Ex. 9 p. p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 10; Appendix Ex. 15-17). Defendants were aware that the administration of CDBG-DR funds was required to meet federal accessibility standards. (Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21; Appendix Ex. 12 p. 7).

Despite Mr. Smith's numerous communications to Defendants about the specific reasons the manufactured home was not accessible to him, Defendants refused to provide Mr. Smith with a home that complied with required accessibility features or met his individual disability-related needs. (Appendix Ex. 1 ¶ 7, 10-17; Appendix Ex. 3 p. 5-16; Appendix Ex. 9 p. p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 10; Appendix Ex. 15-17). Mr. Smith cannot use his wheelchair in his home and has been forced to scoot around on a rolling desk chair; he cannot safely access the bathtub and has been forced to bathe using a rag in the sink; and he cannot safely access the toilet and must seek physical assistance. (Appendix Ex. 1 ¶ 10-17; Appendix Ex. 4 p. 15:13-25, 16:1-25,

17:17-25, 18:1-5, 21:11-25, 22-23, 24:1-2). Defendants' refusal to meet required accessibility standards made the dwelling provided through the federally funded CDBG-DR program "otherwise unavailable" to Mr. Smith because he was not afforded the opportunity to fully use and enjoy the home. This amounts to intentional discrimination and is a violation of 42 U.S.C. §3604(f)(1).

Even when a plaintiff receives a "dwelling", that dwelling may be "otherwise unavailable" under §3604(f)(1) if it is not usable to the recipient. In *Growth Horizons, Inc v. Delaware County, Pennsylvania,* the Third Circuit rejected the defendant's argument that in order to assert a claim under §3604(f)(1) plaintiffs must prove that defendant's actions made it "impossible" for them to obtain housing. The Court held that "conduct short of foreclosing a housing opportunity altogether may violate the statute." 983 F.2d 1277, 1283 (3rd Cir. 1993). See also, *Hunter v WPD Mgmt., LLC*, 476 F. Supp. 3d 731, 734-35 (7th Cir. 2020) ("[A] condition that makes a dwelling uninhabitable due to a person's disability arguably does make it 'unavailable' to that person, which is all the statute's language requires."); see also *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 610-11 (3rd Cir. 2000) (Synthesis of Cir. Court decisions).

**b. Defendants intentionally discriminated against Mr. Smith in the terms, conditions, or privileges in the provision of services in connection with a dwelling, because of his disability in violation of 42 U.S.C. §3604(f)(2).**

Prohibited actions under 42 U.S.C. 3604(f)(2) include "[l]imiting the use of privileges, services or facilities associated with a dwelling because of [...] handicap [...] of an owner [...]." 24 CFR §100.65(b)(4). The FHA not only requires that individuals be given the opportunity to secure housing in a non-discriminatory manner, but also "guarantees their right to equal treatment once they have become residents of that housing." *Housing Rights Center v. Sterling*, 404 F. Supp. 2d.

1179, 1192 (C.D. Cal. 2004). Defendants were required to meet federal accessibility standards in their administration of CDBG-DR funds. (Appendix Ex. 5 p. 14, 17-21, 26, 51, 62; Appendix Ex. 7 p. 19-21). Defendants issued and used, as a program policy, specifications different than those provided in either the 2010 ADA Standards or the UFAS. (Appendix Ex. 12 p. 19-22; Appendix Ex. 13 p. 15-16). Those specifications did not provide substantially equivalent or greater access to the home, as required by the program regulations. (Appendix Ex. 3 p. 5-16). Once Mr. Smith saw the home chosen by Defendant Excel, he repeatedly informed Defendants that he could not access fundamental parts of the home, such as the bathtub. (Appendix Ex. 9 p. p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304). Defendant NCORR testified, "per the bid specifications, the general contractor chooses the unit. And as long as [the MHU] meets the requirements of the bid solicitation, no reason to change it." (Appendix Ex. 11 p. 53:8-11). Mr. Smith's requests for accessibility beyond the bid specifications were further denied by Defendant NCORR who relied on its April 9, 2019, CDBG-DR Single-Family Housing Recovery Program Manual V. 4.0, which states, "[a]pplicant scope [of work] changes do not include changes that are the result of unforeseen conditions or discrepancies in contract documents (specifications or drawings). In general, applicant change orders are not allowable *unless related to an accessibility issue that has developed since the issuance of the [Notice to Proceed]*." (emphasis added) (Appendix Ex. 8 p. 27). This policy takes no account of this situation, where Mr. Smith's disability was not merely foreseen, but known, and was inaccessible by design.

A policy that explicitly subjects a protected class to treatment differing from that of non-members of the protected class is facially discriminatory. *Bangertner v. Orem City Corp.*, 46 F.3d

1491, 1500-01 (10th Cir. 1995). Additionally, courts have held that the imposition of an unreasonable condition on approval of a reasonable accommodation or modification may constitute a refusal to permit the accommodation or modification. See *United States v. Freer*, 864 F. Supp. 324, 326 (2nd Cir. 1994).

Defendant NCORR created policies that prevented individuals with disabilities from obtaining housing that met their disability-related needs. When asked to modify or alter these policies, Defendant NCORR refused to do so. Defendant Excel relied on these polices, despite knowing the specifications were different than the 2010 ADA Standards. (Appendix Ex. 21 p. 23-29). These actions prevented Mr. Smith from obtaining a home that was accessible to and usable by him. While individuals without disabilities were able to receive and enjoy the full benefits of the CDBG-DR Housing Recovery Program, Defendants denied Mr. Smith those benefits because of his disability.

**c. Defendants discriminated against Mr. Smith when they refused to provide reasonable accommodations and modifications in violation of 42 U.S.C. §3604(f)(3)(A) & (B).**

Mr. Smith is a person with a disability and Defendants knew the nature and extent of Mr. Smith's disability. (SMF ¶¶ 1&2; Appendix Ex. 1 ¶ 7). Mr. Smith repeatedly communicated with Defendants about his disability-related needs and repeatedly requested a home that would meet those needs. (Appendix Ex. 9 p. p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 10; Appendix Ex. 15-17). Based on the undisputed documentation provided by Defendant NCORR, between April 8, 2020, and July 5, 2022, Mr. Smith made no less than forty (40) requests for an accessible home, the majority of which were during construction. (Appendix Ex. 9 p. 12-13, 17-19, 30-31, 36-36,

39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304). Among those requests, between May 13, 2021, and May 19, 2021, Mr. Smith corresponded with Defendant NCORR regarding the ramp, submitting a construction complaint on May 14, 2021, and adding to his construction complaint on May 18, 2021. (SMF ¶ 30). This correspondence included Mr. Smith explaining that his previous ramp was "built by ADA codes and standards through the program Independent Living. Which is [also] a State run program [...]" and sending a copy of the building plans for the previous accessible ramp to Defendant NCORR. (SMF ¶ 31).

On or before June 3, 2021, Defendant NCORR received an email from Mr. Smith with pictures of the main bathroom. Case Management notes from that date state,

> "[Mr. Smith] informed [NCORR] that the contractor sent him pictures on today of the bathroom. [Mr. Smith] informed [NCORR] that [Excel] stated he need [him] to sign off on paperwork saying that the garden tub/shower was okay with [him] and also that [he] doesn't mind having cabinet doors on the cabinets in the bathroom and kitchen. [Mr. Smith] informed [NCORR] that he did tell [Excel] that he has no problem with cabinet doors or the garden tub/shower; however if [NCORR] takes a closer look at the pictures; it does not look like a true handicap accessible bathroom because how does [Excel] expect [him] to roll a wheelchair [...] up to the bathtub with the toilet sitting out so far and right beside the bathtub. [Mr. Smith] informed [NCORR] that he originally told [Excel] that he wanted just a shower in his bathroom; but he guess [*sic*] this is one situation where he is glad [Excel] did not listen, because it would have been even harder trying to transition into a shower." (Appendix Ex. 9 p. 226).

On June 4, 2021, Defendant NCORR received another call from Mr. Smith with concerns about the accessibility of the home. Case management notes from that date states,

> "[Mr. Smith] stated that he does not believe his home is handicap accessible and the small bathroom is not handicap accessible. [...] [Mr. Smith stated that [Excel] informed him that he would replace the tub with a walk in shower if [Mr. Smith] wants him to. [Mr. Smith] stated that he is concerned as to whether he can maneuver his wheelchair pass [*sic*] the toilet to access the bathtub. [NCORR] advised him to send [Excel] the measurements of his chair and ask him to check. [NCORR] also told [Mr. Smith] to consider the possibility that the pictures of the bathroom setting may not depict the actual size well and is causing it to appear that it is not enough room." (Appendix Ex. 9 p. 61).

At multiple times, Defendant NCORR responded to these requests that Mr. Smith's concerns could be addressed at the completion of construction. (Appendix Ex. 9 p. 30-50). However, once construction was complete, Mr. Smith was told by Defendants that nothing would be changed. (Appendix Ex. 9 p. 30-50).

Defendants Refused to Grant Reasonable Accommodations

The FHA makes it unlawful for a housing provider to refuse to "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [...] equal opportunity to use and enjoy a dwelling [...]." 42 U.S.C. §3604(f)(3)(B). An accommodation is "necessary" if it is shown that there is "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided" to the person with a disability. *Bryant Woods Inn v. Howard Cty.*, 124 F.3d 597, 604 (4th Cir. 1997).

When Mr. Smith informed Defendants that his home needed to provide space for his wheelchair, they were required to make accommodations to the bid specifications by designating minimum floor space requirements to allow wheelchair use. (Appendix Ex. 12 p. 19-22). Additionally, when Mr. Smith discovered that the manufactured home provided by Defendants was inaccessible to his disability-related needs, Defendants were required to grant reasonable accommodation to their construction policies to allow modification of the MHU to meet those needs. (Appendix Ex. 8 p. 27 ¶ 7.4.2).

Defendants Refused to Provide Reasonable Modifications

The FHA makes it unlawful for a housing provider to refuse to modify a dwelling for a person with a disability "if such modifications may be necessary to afford such person full enjoyment of the premises [...]." 42 U.S.C. §3604(f)(3)(A). When Mr. Smith discovered that the

manufactured home provided by Defendants was inaccessible to his disability-related needs, Defendants were required to provide modifications to the MHU to meet those needs.

The expense of necessary modifications is typically the responsibility of the occupant, except when a housing provider receives federal financial assistance. When a housing provider receives federal financial assistance, such as the Defendants, they bear the expense for reasonable modifications that are necessary for the occupant's disability-related needs. See *Evans v. ForKids, Inc*., 306 F.Supp.3d 827, 839 (E.D.VA. 2018); *Alexander v. Choate*, 469 U.S. 287 (1985); 29 U.S.C. §794. Because Mr. Smith requires the use of a wheelchair full-time, it is necessary that he has a home that provides adequate floor space and other space for his wheelchair, so he may be afforded full use and enjoyment of that home.

After learning the home was not wheelchair accessible, Mr. Smith repeatedly requested that Defendants modify the home to meet his disability-related needs. Defendants did not make those reasonable modifications to Mr. Smith's home. (Appendix Ex. 3 p. 5-16; Appendix Ex. 9 p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 10; Appendix Ex. 15-17).

**d. <u>Mr. Smith did not waive his right to bring a claim under the FHA</u>**

Mr. Smith did not waive his right to request any disability-related accommodations to CDBG-DR Homeowner Recovery Program policies; his right to request disability-related modifications to the home provided; or his right to bring this claim. It is undisputed that Mr. Smith signed the "Applicant Acceptance of Work and Receipt of Warranty Notice." (Appendix Ex. 20). The "Applicant Acceptance of Work and Receipt of Warranty Notice" was a requirement of the program; refusing to sign would not prevent closeout of the job but merely prevent issuance of a

warranty on the home. (Appendix Ex. 11 p. 59-62). Signing this notice did not abrogate Mr. Smith's rights under the FHA. Even if Mr. Smith was aware Defendants' actions were potentially illegal, this notice contains no language regarding his rights under the FHA, and the material facts contain no evidence that Mr. Smith intended to relinquish his ability to assert his rights under the FHA. See *United States v. Olano*, 507 U.S. 725, 733 (1993) (holding that "waiver is the 'intentional relinquishment or abandonment of a known right.'"); *Simovits v. Chanticleer Condo. Ass'n.* 933 F. Supp 1394, 1405 (E.D. Il. 1996) (holding that, even though the Plaintiff was cognizant of Defendant's potential liability, there was no evidence that they intended to relinquish their right to sue under the FHA).

**e. <u>Mr. Smith is entitled to damages under the FHA</u>**

Mr. Smith is entitled to damages under the FHA, and his claim is not time-barred. A private person "may commence a civil action in an appropriate United States district court [...] not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice [...] to obtain appropriate relief with respect to such discriminatory housing practice or breach." 42 U.S.C. §3613(a)(1)(A). It is undisputed that, (1) on March 23, 2023, Mr. Smith submitted an administrative complaint to HUD's Fair Housing and Equal Opportunity Office; and (2) on or about June 25, 2025, Mr. Smith submitted a request for consideration of the May 21, 2025, "no-cause" determination issued by the Fair Housing and Equal Opportunity Office. (SMF ¶¶ 57 & 58). The "computation of such 2-year period shall not include any time during which an administrative proceeding under this subchapter was pending with respect to a complaint or charge under this subchapter based upon such discriminatory housing practice." 42 U.S.C. 3613(a)(1)(B).

## C. DEFENDANTS VIOLATED SECTION 504 OF THE REHABILITATION ACT OF 1973

Defendants violated Section 504 when they denied Mr. Smith the benefits of the CDBG-DR Homeowner Recovery Program, based solely by reason of his disability. 29 U.S.C. §794.

1. **<u>CDBG-DR funds and Defendants are subject to the requirements of Section 504 of the Rehabilitation Act of l973.</u>**

Defendants as administrators and contractors of the federally funded CDBG-DR Homeowner Recovery are subject to the non-discrimination requirements of Section 504. 29 U.S.C. §794; 24 C.F.R. Part 8. (Appendix Ex. 7 p. 19-21).

Under 42 U.S.C. 2000d-7(a)(1), a State "shall not be immune under the Eleventh Amendment of the Constitution of the United States from a suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973 [...]." Defendants State of North Carolina and NCORR are, therefore, subject to the requirements of Section 504.

Defendant Excel, through their contract with Defendants State of North Carolina and NCORR, were responsible for adhering to the requirements of CDBG-DR funds. Provided in Section 3.2 of the "Homeowner-Contractor Replacement and Elevation Agreement," Defendant Excel's disbursement of CDBG-DR funds was "[s]ubject to compliance with the terms and conditions of all CDBG-DR Housing Recovery Program policies and procedures and all Agreements incorporated [in the Homeowner-Contractor Replacement and Elevation Agreement] by reference [...] ." (Appendix Ex. 14 p. 17).

To prevail on a claim under Section 504, a plaintiff has the burden of proving that "(1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." [internal

citations omitted] *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 498 (4th Cir. 2005).

The definition of "disability" for Section 504 is substantially the same as the definition as the FHA and the ADA.[18] As established, Mr. Smith has a disability that substantially limits his mobility. (SMF ¶¶ 1&2; Appendix Ex. 1 ¶ 2). As established by the "Homeowner-Contractor Replacement and Elevation Agreement," Mr. Smith was eligible to receive the benefit of the CDBG-DR Homeowner Recovery Program. (Appendix Ex. 14 p. 1).

**2. <u>Defendants denied Mr. Smith the benefit of a federally assisted program because of his disability.</u>**

Section 504 and its implementing regulations at 24 C.F.R. Part 8 prohibit programs that receive federal funding from excluding individuals with disabilities solely by reason of their disability.[19] That prohibition extends to structural modifications necessary to allow an otherwise qualified individual to enjoy the full benefit of the program. Section 504 requires that individuals with disabilities "be provided with meaningful access to the benefit that the grantee offers," one benefit being the "elimination of architectural barriers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). When the federally funded program provides housing, this means that the housing providers, here the Defendants, are responsible for the cost of reasonable modifications that are necessary for the program participant's disability-related needs. See *Evans v. ForKids, Inc.*, 306 F.Supp.3d 827, 839 (2018); 29 U.S.C. §794. 24 C.F.R. §8.29 provides that any "single family (including semi-attached and attached) units to be constructed or rehabilitated in a program or activity receiving federal financial assistance shall be made accessible upon request [...] if the nature of the handicap of an expected occupant so requires. [...]." 24 CFR §570.202(a)(1) additionally provides that CDBG funds may be used to finance the rehabilitation of privately

---

[18] See 29 U.S.C. §705; 42 U.S.C. §12102.
[19] See 29 U.S.C. §794; 24 C.F.R. Part 8.

owned buildings and improvements for residential purposes." Further, the protections of Section 504 and the federal accessibility standards found in 24 C.F.R. Part 8 apply to single-family homes provided to homeowners with federal funds from HUD. See *Telesca v. Long Island Hous. P'ship,* 443 F.Supp.2d 397, 409 (2006).

In order for Mr. Smith to fully use and enjoy his home, he requires a home with sufficient space for him to access all the rooms in his house with his wheelchair. While individuals without disabilities were able to receive and enjoy the full benefits of the CDBG-DR Housing Recovery Program, Defendants denied Mr. Smith those benefits because of his disability.

**a. Mr. Smith did not waive his right to bring a claim under Section 504.**

As provided above, Mr. Smith signed the "Applicant Acceptance of Work and Receipt of Warranty Notice." (Appendix Ex. 20). However, his signature did not waive his right to make a claim under Section 504, nor did it abrogate Mr. Smith's rights under Section 504. Even if Mr. Smith was aware Defendants' actions were potentially illegal, this notice contains no language regarding his rights under Section 504, and the material facts contain no evidence that Mr. Smith intended to relinquish his ability to assert his rights under Section 504. See *United States v. Olano*, 507 U.S. 725, 733 (1993).

**b. Mr. Smith is entitled to damages under Section 504.**

The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 280 (2001)). See also 29 U.S.C. §794a(a)(2). Further, private individuals may obtain monetary damages for claims of intentional discrimination. See *Blunt v. Lower Merion Sch. Dist.*,

767 F.3d 247, 272 (3d Cir. 2014); *Yakin v. Univ. of Ill.*, 508 F. Supp. 848, 852 (N.D. Ill. 1981), aff'd, 760 F.2d 270 (7th Cir. 1985).

### D. DEFENDANTS STATE OF NORTH CAROLINA AND NCORR VIOLATED THE AMERICANS WITH DISABILITIES ACT OF 1990.

The burden of proof to prevail on a claim under the ADA[20] contains the same elements as a claim under Section 504.[21] Mr. Smith brings claims for ADA violations against Defendants State of North Carolina and NCORR only.

Defendants State of NC and NCORR are subject to the non-discrimination requirements of the ADA. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity[22], or be subjected to discrimination by any such entity."[23] Defendant State of NC and NCORR are "public entit[ies]" under this statute and received CDBG-DR funds to operate the CDBG-DR Homeowner Recovery Program and are not protected by sovereign immunity from the jurisdiction of this Court for violations of the ADA.[24]

### E. DEFENDANT EXCEL BREACHED A VALID CONTRACT WITH PLAINTIFF

---

[20] 42 U.S.C. § 12101 *et seq.*

[21] "(1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." [internal citations omitted] *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 498 (4th Cir. 2005).

[22] A "public entity" is any "State or local government [...] any department, agency, special purpose district, or other instrumentality of a State or States or local government" 42 U.S.C. §12131(1); 28 C.F.R. § 35.104.

[23] 42 USC § 12132.

[24] Under 42 U.S.C. 12202, a State "shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of [the Americans with Disabilities Act]." See also *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005).

To prevail on a claim for breach of contract, a plaintiff must first establish that there was a valid contract by proving that (1) the plaintiff and the defendant(s) mutually assented to the same material terms for doing or refraining from doing a particular thing; and (2) that the mutual assent of the parties was supported by adequate consideration. See N.C.P.I. - Civil 501.01; *Richardson v. Greensboro Warehouse and Storage Co.*, 223 N.C. 344, 26 S.E.2d 897 (1943); *Central Sys. V. General Heating and Air Conditioning Co*., 48 N.C. App. 198, 268 S.E.2d 822, *cert. denied*, 302 N.C. 400, 273 S.E.2d 445 (1980). The plaintiff must then prove that (1) the time had come for the defendant(s) to abide by a material term of the contract, meaning that at the time of the alleged breach all conditions precedent to the defendants' obligation to perform was satisfied; and (2) that the defendants failed to abide by a material term of the contract. See N.C.P.I. - Civil 502.00; *Wade v. Lutterloh*, 196 N.C. 116, 120, 144 S.E.2d 694, 696 (1928).

1. **Defendant Excel and Mr. Smith mutually assented to the same material terms, supported by consideration.**

Defendant Excel and Mr. Smith mutually assented to a contract with the same material terms, and that assent was supported by adequate consideration. "The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds." *Snyder v. Freeman,* 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). To form a contract, "an offer and acceptance are essential elements." *Yeager v. Dobbins*, 252 N.C. 824, 828, 114 S.E. 2d 820, 823 (1960).

It is undisputed that on or about April 8, 2020, Mr. Smith and Defendant Excel signed the "Homeowner-Contractor Replacement and Elevation Agreement," a written document. (Appendix Ex. 14, signatures on p. 19). Mr. Smith and Defendant Excel took on responsibilities under this agreement, including "a condition of the Grant and payment of Contractor's work with grant funds, Owner and Contractor agree to comply with [...] in particular CDBG-DR rules, procedures and/or

requirements to the extent they are applicable to this Agreement and/or Scope of Work." (Appendix Ex. 14 p. 18).

A contract, to be enforceable, must be supported by adequate consideration. [25] Consideration which is sufficient to support a contract "consists of 'any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Lee v. Paragon Group Contractors*, 78 N.C. App. 338, 337 S.E.2d at 134. Consideration does not have to be proportional to the benefit conferred or the burden undertaken, and even slight or trifling consideration is adequate to support a mutual agreement otherwise reached by mutual assent. *Young v. Bd. Of Comm'rs of Johnston Co.*, 190 N.C. 52, 57. 128 S.E. 401, 403 (1925).

As noted before, Mr. Smith provided consideration in the amount of $1,118.84 to pay for part of the replacement and elevation. (Appendix Ex. 14 p. 1). He additionally was required to meet the terms enumerated under Article Two: Owner Rights, Responsibilities, and Warranties under the Agreement. (Appendix Ex. 14 p. 14-17).

2. **<u>Defendant Excel breached the contract when they refused to provide Mr. Smith with an accessible home.</u>**

Paragraph 4.8 of the "Homeowner-Contractor Replacement and Elevation Agreement" states:

> "Owner and Contractor recognize and understand that this Agreement includes the CDBG-DR Program Policies and Procedures that are referenced herein, Attachments hereto and on ReBuild NC website (in particular the State's Action Plan (as amended) and Housing Recovery Program Manual (as amended)), and the construction documents. These documents constitute the entire Agreement and all prior agreements and/or oral representation/agreements are merged into this Agreement." (Appendix Ex. 14 p. 19).

[25] See *Matthews v. Matthews*, 2 N.C. App. 143, 162 S.E.2d 697 (1968).

As established, when the manufactured home ordered by Defendant Excel was discovered by Mr. Smith to be inaccessible to his disability-related needs, Mr. Smith repeatedly notified Defendant Excel of the breach of the agreed-upon contract. (Appendix Ex. 9 p. 12-13, 17-19, 30-31, 36-36, 39, 43-45, 48-49, 51-52, 54, 58-59, 61-62, 67, 72-73, 87, 100-101, 121, 127-128, 129-130, 172, 194, 196-200, 203-205, 209, 211-212, 214, 218, 221-222, 225-227, 232, 235, 291, 293, 298, 304; Appendix Ex. 15-17). Defendant Excel did not remedy the breach. (Appendix Ex. 1 ¶ 10-17; Appendix Ex. 3 p. 5-16). Defendant Excel therefore breached a material term of the contract with Mr. Smith when they failed to provide an accessible home to Mr. Smith, despite his meeting all of his obligations under the contract.

**3. <u>Mr. Smith did not waive his right to bring a claim for breach of contract.</u>**

The Agreement between Mr. Smith and Defendant Excel provides that the informal or formal dispute resolution process "shall not apply to any state or federal [...] civil action [...] relating to any violation of state or federal law arising out of or related to the Project." (Appendix Ex. 14 p.10). Mr. Smith's later signing of the "Applicant Acceptance of Work and Receipt of Warranty Notice" did not waive his right to make a claim for breach of contract. The language contained in the notice provides that "the construction [...] has been completed in compliance with the provisions of the contract." (Appendix Ex. 20 ¶ 1). However, it additionally states that "[d]uring the warranty period, I/We understand that I/We must give notice of any observed defects within thirty days (30) days of discovery" allowing for additional complaints. (Appendix Ex. 20 ¶ 5). Mr. Smith exercised his right and made claims signing this notice, and Defendant Excel addressed some reported construction issues, but none that were related to the accessibility of the home. (Appendix Ex. 15-17).

**4. <u>Mr. Smith is entitled to damages.</u>**

Direct damages are the economic losses that usually or customarily result from a breach of contract. "In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made." *Stanback v. Stanback*, 297 N.C. 181, 187, 254 S.E.2d 611, 616 (1979).[26] Pursuant to N.C.G.S. §1-50(a)(5)(b), Mr. Smith is within the statute of limitations to bring an action based on breach of contract to construct or repair an improvement to real property.

**CONCLUSION**

For the reasons set forth above, Mr. Smith respectfully requests the Court to grant his Motion for Partial Summary Judgment and find Defendants liable for the claims as provided above. Plaintiff further requests any and all other relief the Court deems necessary under the circumstances.

Respectfully submitted this on the 14th day of September 2026.


By: /s/ Ashley Denise Skaff
Ashley Denise Skaff
Legal Aid of North Carolina, Inc. – Fair Housing
2101 Angier Ave. Ste. 300
Durham, NC 27703
(984) 297-2017
Fax: (919) 861-1887
State Bar No. 54295

/s/ Shrayan Shetty
Shrayan Shetty
NORTH CAROLINA JUSTICE CENTER
P.O. Box 28068
Raleigh, North Carolina 27611
Tel: (919) 856-2164
State Bar No. 59552
*Attorneys for Plaintiff*


[26] See also N.C.P.I. 503.21.